UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

      Plaintiff,

 v.                    Case No. 23-cr-0042-bhl

JETON E. YOUNG,

      Defendant.

## ORDER ADOPTING JUDGE DRIES'S REPORT AND RECOMMENDATION AND DENYING DEFENDANT'S MOTION TO SUPPRESS

    Defendant Jeton E. Young, a convicted felon, has moved to suppress evidence of a firearm seized from his jacket pocket at the time of his arrest, claiming the police officers did not have reasonable suspicion to detain him or probable cause to arrest him. In a Report and Recommendation, Magistrate Judge Stephen Dries analyzed the parties' arguments and concluded that Young's motion to suppress should be denied. (ECF No. 38.) Young has objected to the Report. (ECF No. 43.) Because the record confirms that Judge Dries correctly concluded police had both reasonable suspicion to detain and probable cause to arrest Young, the Court will adopt his Report and deny Young's suppression motion.

## BACKGROUND

    On February 8, 2022, at approximately 10:00 p.m., four Milwaukee police officers, Nicolas Romeo, Tyler Zelinski, Robert Parks, and Adam Maritato, responded to a shooting, later confirmed to be a homicide, at 2800 W. Melvina Street in Milwaukee, Wisconsin. (Ex. C, Romeo Supplemental Rep.) At the time, witnesses informed the officers that two individuals wearing dark clothing had run towards North 27th Street. (*Id.* at 1.) As Romeo and Maritato canvassed the area, both officers activated their body-worn cameras. (Ex. A, Maritato BWC.mp4; Ex. B, Romeo BWC.mp4; Ex. 6, Romeo's complete body-camera footage.) The officers proceeded towards North 27th Street and observed a gray Dodge Journey parked and with its engine running in front of a house at 3853 N. 27th Street, approximately one block east of the homicide scene. (Ex. C at

1.) Because the windows were tinted, Romeo could not determine if anyone was inside the Dodge. (*Id.*)

When they arrived at the corner of Melvina and 27th Street, Romeo and Maritato used their flashlights to illuminate the yard on the southwest corner. (Ex. 6 at 22:08:50–22:09:06.) They observed an individual—later identified as Young—on the porch of the house at 3853 N. 27th St. (*Id.* at 22:09:09–11.) Young was wearing a multi-colored jacket and light-gray pants. Maritato asked Young if he had seen or heard the shooting. (*Id.* at 22:09:23–27.) Young responded that his stepmother had heard "something." (*Id.* at 22:09:27–31.) Young then voluntarily stepped off the porch, walked down the steps and placed his hands in his jacket pockets. (*Id.*) Maritato asked Young if he was present at the time of the shooting. (*Id.* at 22:09:30–31.) Young responded, "Ah, no." (*Id.* at 22:09:31–34.) Maritato passed Young and walked up to the porch steps, apparently intending to speak with Young's stepmother. (*Id.* at 22:09:38–45.) Young remained facing Romeo, approximately 10 feet away, and Romeo saw the outline of an upside-down handgun in Young's left jacket pocket. (Ex. C. at 1.) At one point, Young voluntarily placed his hands on top of his head making the gun's outline apparent. (*Id.*) The body worn camera confirms the outline of an object in Young's left front pocket. (Ex. 6 at 22:09:30.)

Romeo then stepped into the walkway in front of Young and asked Young if he had a concealed carry weapon permit:

      Romeo: You got a CCW?
      Young: Huh?
      Romeo: Do you have a CCW?
      Young: A CCW?
      Romeo: Yeah, for the gun in your pocket.

(*Id.* at 22:09:47–53.) Romeo reports that as Young walked closer to him (approximately two feet away), he could also smell a strong order of fresh marijuana emanating from Young's person. (Ex. C at 1.) As Romeo was asking Young whether he had a CCW, Maritato descended the porch stairs, placing Young between the two officers. (Ex. 6 at 22:09:53.) Romeo then appears to place his hand on Young's arm, as Young denies having a gun in his pocket stating, "I don't have no gun in my pocket." (*Id.* at 22:09:53–56.) The officers removed Young's hands from his pockets and Romeo recovered a 9mm Beretta from Young's front left jacket pocket. (*Id.* at 22:09:56–22:10:27.) Romeo placed Young in handcuffs and continued to ask Young if he had a CCW but Young did not answer. (*Id.* at 22:10:13–44.) The officers ultimately arrested Young and also

recovered 15.2 grams of marijuana from his jacket pocket. (Ex. C at 2.) They also discovered the handgun had a bullet in the chamber. (*Id.*)

In March 2023, a grand jury indicted Young for illegally possessing the handgun as a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (ECF No. 1.) On July 11, 2023, Young filed a motion to suppress evidence and requested an evidentiary hearing. (ECF No. 20.) Magistrate Judge Stephen Dries granted the hearing request and held a hearing on August 23, 2023. (ECF Nos. 22 & 29.)

At the hearing, Romeo was the only testifying witness. He explained that when he observed Young on the porch, he could see a heavy bulge in Young's front left jacket pocket. (ECF No. 32 at 12:22–13:5, 28:9–16, 58:5–16.) Romeo further testified that as Young walked down the porch steps and placed his hands on top of his head, he could clearly see the imprint of an upside-down firearm in Young's jacket. (*Id.* at 12:22–13:5; 14:6–9; 23:15–24:4, 55:21–56:5, 58:11–24.) When Young was about two feet away from him, Romeo testified that he detected a strong odor of fresh marijuana coming from Young's person. (*Id.* at 14:24–15:2.) Romeo explained that, as result of his training and experience, he recognized the smell of fresh marijuana, as opposed to a burnt smell. (*Id.* at 15:3–16:25.) Romeo acknowledged on cross examination that he did not mention smelling marijuana at any point during his interaction with Young and did not mention the perception of that odor to Maritato. (*Id.* at 44:13–45:14.)

## LEGAL STANDARD

A district court judge "makes the ultimate decision to adopt, reject, or modify" a magistrate judge's report and recommendation. *Schur v. L.A. Weight Loss Ctrs., Inc.*, 577 F.3d 752, 760 (7th Cir. 2009). The district court reviews, *de novo*, "those portions of [a Magistrate Judge's] report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Crim. P. 59(b)(3). This "[d]e novo review requires the district [court] judge to decide the case based on an independent review of the evidence and arguments without giving any presumptive weight to the magistrate judge's conclusion." *Mendez v. Republic Bank*, 725 F.3d 651, 661 (7th Cir. 2013). Unchallenged portions of the report are reviewed only for clear error. *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 739 (7th Cir. 1999) (citing *Goffman v. Gross,* 59 F.3d 668, 671 (7th Cir. 1995)).

# ANALYSIS

Magistrate Judge Dries concluded that the officers had reasonable suspicion to detain Young based on his proximity to the shooting, his purportedly evasive behavior, the bulge in his jacket, and his responses to the officers' questions. Judge Dries further concluded that even if reasonable suspicion was lacking, the officers had probable cause to arrest Young based on the odor of marijuana. Young objects to both findings. Because the facts presented are sufficient to establish both reasonable suspicion and probable cause, the Court will overrule Young's objections, adopt Judge Dries's Report, and deny the motion to suppress.

## I. The Police Officers Had Reasonable Suspicion to Detain Young.

The parties do not dispute that the officers' questioning of Young, preceding the seizure of the firearm, constituted a consensual encounter rather than a seizure of his person. *See United States v. Pace*, 48 F.4th 741, 748 (7th Cir. 2022) ("[T]here is no constitutionally cognizable seizure 'simply because a police officer approaches an individual and asks a few questions.'") (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). The encounter was consensual even though the initial questioning happened while Young was on his porch. *See United States v. Breland*, 356 F.3d 787, 791 (7th Cir. 2005) (finding that an officer who asked to talk with an individual on or near his front porch "was *attempting* to engage in a consensual encounter") (emphasis in original).

The parties take issue over when Young was seized and whether the officers had reasonable suspicion to detain him. "The Fourth Amendment allows officers to briefly detain and stop a person for investigative purposes even where probable cause is lacking where the officer has a reasonable suspicion based on articulable facts that criminal activity may be occurring." *United States v. Segoviano*, 30 F.4th 613, 619 (7th Cir. 2022) (citing *United States v. Wilbourn*, 799 F.3d 900, 908–09 (7th Cir. 2015); *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). "'Reasonable suspicion' embodies less than probable cause or even a preponderance of the evidence, but more than a hunch." *Id.* (citing *Wilbourn*, 799 F.3d at 909). "Significantly, '[a]n investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity . . . [or] is wanted for past criminal conduct.'" *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981) (emphasis omitted) (alterations in original)). "Based on that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.* (quoting *Cortez*, 449 U.S. at 417–18). "The government bears the burden of establishing

reasonable suspicion by a preponderance of the evidence." *United States v. Uribe*, 709 F.3d 646, 650 (7th Cir. 2013) (citing *United States v. Longmire*, 761 F.2d 411, 418 (7th Cir. 1985)).

Judge Dries concluded that Young was seized at 22:09:55 p.m. when Romeo made physical contact with him. (ECF No. 38 at 10.) Young objects to this determination, contending the police actually seized him twenty seconds earlier, at 22:09:34 p.m., when they "blocked his path." (ECF No. 43 at 2.) The Court agrees with Judge Dries. A review of body camera footage reveals that Young voluntarily stepped off the porch, walked down the steps, and placed himself between the two officers without any prompting. Maritato stood off to the side in the grass as he was trying to talk to Young's stepmother who, according to Young, may have heard the shots. The officers were seeking information regarding the recent shooting and asking questions in a regular tone of voice. They did not display their weapons. Romeo, having observed what appeared to be a firearm in Young's pocket, repeatedly asked Young whether he had a CCW and further clarified "for the gun in your pocket." During this exchange, Maritato walks off the porch and down the steps. The body camera footage does not support any finding that Romeo blocked Young's path during the time Young was standing on the walkway.

At 22:09:55, Young responds, "I don't have no gun in my pocket." This statement was false, and Romeo suspected as much because he saw the outline of a gun in Young's front pocket. Romeo testified that his training and experience led him to believe that Young had a firearm in his jacket pocket. But even an untrained eye can see the outline of what looks to be gun in the footage. At this moment, as Judge Dries determined, Young was seized.

Young contends that the officers lacked reasonable suspicion to seize him and had no information allowing them to suspect him of criminal activity. The Court disagrees. In *Terry v. Ohio*, 393 U.S. 1 (1968), the Supreme Court held that "the police can stop and briefly detain a person for investigative purposes if the officer has reasonable suspicion . . . that criminal activity 'may be afoot,' even if the officer lacks probable cause." *Sokolow*, 490 U.S. at 7 (quoting *Terry*, 392 U.S. at 30). Reasonable suspicion exists if the officer can articulate a "particularized" basis—as opposed to an "inchoate . . . suspicion or 'hunch'" for suspecting the particular person stopped of criminal activity. *Terry*, 392 U.S. at 27. Unlike probable cause, reasonable suspicion requires only a "minimal level of objective justification for the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Sokolow*, 490 U.S. at 7). The standard for reasonable suspicion is "significantly lower" than that of probable cause. When assessing whether an office had reasonable suspicion

to effectuate a *Terry* stop, the Court must give "due weight" to "the specific reasonable inferences" the officer drew "in light of his experience," *Terry*, 392 U.S. at 27, and must consider the "totality of the circumstances." *Sokolow*, 490 U.S. at 8 (citation omitted).

Applying this standard, the Court concludes that Romeo was justified in detaining Young "for investigatory purposes." *See Sokolow*, 490 U.S. at 7. As of 22:09:55, Romeo credibly believed that Young possessed a gun and Young's behavior created reasonable suspicion of criminal conduct. Young had evaded Romeo's questions as to whether he had a CCW permit and engaged in other evasive behavior. He refused to answer whether he had a CCW and then affirmatively denied having a gun, even though officers saw the outlines of a handgun in his coat pocket. Romeo also smelled fresh marijuana emanating from Young. All of these observations occurred at night, approximately one block from a homicide, a relevant contextual consideration. When determining whether an officer had reasonable suspicion, courts examine the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect. *See United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003) (citing *United States v. Quinn*, 83 F.3d 917, 921 (7th Cir. 1996)). Taken together, these observations are more than sufficient to support a reasonable suspicion "criminal activity" was "afoot." *Sokolow*, 490 U.S. at 7.

In jurisdictions where citizens can legally carry concealed weapons, the mere presence of a concealed weapon, without more, cannot support a reasonable suspicion that the suspect is illegally carry that gun; further evidence of criminality is required. *See United States v. Richmond*, 924 F.3d 404, 411–12 (7th Cir. 2019). In this case, Romeo had additional evidence of potential criminality. Young specifically denied having a gun even though Romeo could see the outlines of a handgun in his front pocket. And Romeo smelled marijuana. These facts are far more than an "unparticularized suspicion or hunch." *See Sokolow*, 490 U.S. at 7 (internal quotation and citation omitted). The Court agrees with Judge Dries that the officers had reasonable suspicion to detain Young.

## II. The Police Officers Had Probable Cause to Arrest Young.

Judge Dries also found that the officers had probable cause to arrest Young for marijuana possession relying on controlling precedent, *United States v. Paige*, 870 F.3d 693 (7th Cir. 2017). (ECF No. 38 at 18–21.) "A warrantless arrest is constitutionally permissible if supported by probable cause." *Paige*, 870 F.3d at 699 (quoting *United States v. Sands*, 815 F.3d 1057, 1061–

62 (7th Cir. 2015)). In *Paige*, the Seventh Circuit held that the smell of marijuana emanating from Paige's person gave the police probable cause to arrest Paige for marijuana possession. *Id.* at 700–01. The court stated that "the odor of marijuana, if sufficiently localized to a specific person, provides probable cause to arrest that person for the crime of marijuana possession." *Id.* at 700 (citing *United States v. Perdoma*, 621 F.3d 745, 749 (8th Cir. 2010); *United States v. Humphries*, 372 F.3d 653, 659–60 (4th Cir. 2004)). The court also noted that, because possession of marijuana is a crime in Wisconsin, *see* Wis. Stat. § 961.41(3g)(e), it did not reach "the questions that might arise in a state that permits medical marijuana, or a state that has legalized marijuana across-the-board." *Id.* at 700 n.19.

Romeo reported that as Young approached him, he could smell a strong odor of fresh marijuana emanating from Young's person. (Ex. C at 1.) At the evidentiary hearing, Romeo testified consistent with his report that that he smelled a strong odor of fresh marijuana coming from Young's person when Young was about two feet away from him and no one else was around other than Romeo, Maritato, and Young. (ECF No. 32 at 14:21–15:6.) He further testified that he had training in distinguishing the smell of fresh marijuana from burnt marijuana. (*Id.* at 15:13–21.)

Young objects to Judge Dries's conclusion that Romeo's claim was credible, arguing that several factors undermine Romeo's testimony and affirmatively contending that Romeo provided "a description of the encounter that is verifiably false." (ECF No. 43 at 9.) Young points to Romeo's statement in his report that he observed Young begin walking from the 27th Street residence down towards the Dodge vehicle. According to the report: "Young looked directly at P.O. Maritato and I, place[d] his left hand on the front of his jacket pocket, and walk[ed] back up to the front door of the residence." (Ex. C at 1.) Young contends this statement is refuted by the body camera video footage. (ECF No. 43 at 9–11.) The Court agrees that Romeo's body camera footage does not show Young stepping off the porch and walking along the front walkway towards the parked Dodge vehicle. Maritato's body camera footage shows Young standing on the porch of the residence as the officers walk up Melvina Street to the corner of 27th and Melvina. (Exs. A. and B.) Both officers' body camera videos show Young first standing on the top step of the porch, facing the officers, as the officers shine their flashlights in his vicinity.

At the evidentiary hearing, Romeo acknowledged that the body-camera footage did not show Young stepping off the porch and walking along the front walkway toward the parked

vehicle, as described in his report. (ECF No. 32 at 32:8–42:9.) But he insisted that he saw Young approach the vehicle, look at the officers and immediately turn around and return to the porch. (*Id.* at 66:9–22.) Having reviewed the video, the Court notes that the walkway leading from the front of the residence to the Dodge vehicle is not always visible and thus it is possible Romeo observed Young as described in his report. Young contends that it "strains credulity" to suggest that Romeo's report could be accurate because it would necessitate a finding that his observations of Young walking from and to the porch occurred during the few seconds the walkway is not observable. (ECF No. 43 at 11.) The Court agrees that the description of events in the report appears incorrect, given the video evidence. Judge Dries also acknowledged that the conduct Romeo described in his report "is not depicted on either of the officers' body-cam recordings." (ECF No. 38 at 13.) But this inconsistency, whether implausible or flat-out wrong, does not render the entirety of Romeo's testimony non-credible. Even if Romeo mistakenly reported when he first observed Young, whether walking down the walkway and turning back to the porch or on the porch, these questions do not change the fact that other evidence in the record confirms that Romeo had reasonable suspicion prior to detaining Young.

Young is off base in arguing that Romeo's claim to have seen exhaust coming from the Dodge vehicle is refuted by the body camera footage. In fact, the body-camera footage confirms Romeo's statement. At approximately 22:15:34 (about five minutes after Young is arrested), the video shows exhaust visibly coming from the Dodge and Romeo states on the video, "I see it's running," corroborating his recollection that the vehicle was running as the officers approached Young on the porch and had been running during the entire encounter with Young. (Ex. 6 at 22:14:18–22:15:40.)

Young next argues that "[n]othing the officers said or did suggested they smelled marijuana." (ECF No. 43 a 12.) As noted by the government, the defense cites no authority for the proposition that officers must articulate their perceptions for those perceptions to be meaningfully included in the probable cause calculus. (ECF No. 44 at 16.) The Report found that Romeo provided a reasonable explanation for not mentioning marijuana during his interaction with Young as Romeo credibly testified that he was focused on the suspected firearm in Young's pocket rather than the marijuana as the firearm posed a more imminent danger than the suspected marijuana. (ECF No. 32 at 68:1–2.) Romeo also testified that inquiring about marijuana risked escalating a situation with someone who already seemed to pose a danger by possessing a firearm

(that he was attempting to conceal by placing his hands in his pockets). (*Id.* at 67:9–22.) Even Young acknowledges that this explanation may excuse Romeo's failure to acknowledge the odor before the seizure. (ECF No. 43 at 12.)

Young further complains that if Romeo really smelled marijuana, it is reasonable to expect that he would have offered that as the basis for the search. Romeo testified that the smell was apparent and yet it is undisputed that at no point did Romeo or Maritato narrate into their body cameras that they had smelled marijuana. Romeo's testimony at the evidentiary hearing, however, persuaded Judge Dries that Romeo was focused on the gun and did not want to escalate the situation. Romeo provided a reasonable explanation for not acknowledging the odor of marijuana.

Young finally attempts to undermine Romeo's credibility by claiming that Romeo "testified incredibly (i.e., untruthfully)" in a different case before Judge Joseph. (ECF No. 43 at 13.) The government explains that Young is referencing *United States v. Rodgers*, No. 17-CR-117, 2017 WL 11812620 (E.D. Wis. Sept. 19, 2017), in which Judge Joseph found one aspect of the testimony—whether the officers saw two individuals prior to making a U-turn—was inconsistent with the fact that they were stopped seconds after the police squad tuned around. *Id.* at *7. Judge Joseph, however, never specifically determined that Officer Romeo, who was one of the officers, or any other officer, engaged in any deliberate falsehood. The Court agrees with Judge Dries that Young overstates Romeo's credibility concerns. Judge Dries determined that Young failed to show that Romeo made verifiably false representations in this case and concluded that nothing in Romeo's behavior or testimony at the evidentiary hearing suggested that he was not being truthful. (ECF No. 38 at 20.) The Court agrees with Judge Dries's conclusion and will not disturb his findings.

In conclusion, Romeo noticed the odor of fresh marijuana when Young approached him, a violation of Wis. Stat. § 961.41(3g)(e). Having localized the fresh marijuana smell to Young, the only other person in the vicinity other that the officers, Romeo had probable cause to arrest Young because he had reason "to believe that [Young had] committed or [was] committing the crime of possession of marijuana." *See Paige*, 870 F.3d at 700. "If an officer has probable cause to arrest, [he] may conduct a search incident to that lawful arrest without any additional justification." *Id.* at 700 (citing *United States v. Robinson*, 414 U.S. 218, 235 (1973)). Thus, since the officers had probable cause to arrest Young, the search of him and subsequent seizure of his firearm was lawful.

## CONCLUSION

After a *de novo* review of Magistrate Judge Dries's report and recommendation, (ECF No. 38), the Court overrules Young's objections and adopts Judge Dries's report recommending that Young's motion to suppress be denied.

Accordingly,

**IT IS HEREBY ORDERED** that Magistrate Judge Dries's report, ECF No. 38, recommending that Young's Motion to Suppress, (ECF No. 20), be denied is **ADOPTED**.

**IT IS FURTHER ORDERED** that Young's Motion to Suppress, ECF No. 20, is **DENIED**.

Dated at Milwaukee, Wisconsin on April 24, 2024.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge